Filed 11/30/21  Shamaan v. Cotta CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| IHSAN N. SHAMAAN,<br><br>Appellant,<br><br>v.<br><br>SAAD Y. COTTA,<br><br>Respondent. | B305682, B309977<br><br>(Los Angeles County Super. Ct. Nos. 18NWCV00199, BC583501) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Olivia Rosales and David Sotelo, Judges. Affirmed.

Law Offices of James A. Frieden, Benjamin I. Bastomski and James A. Frieden; Czech & Howell and Jeffery J. Czech for Appellant.

Thomas Vogele & Associates, Thomas A. Vogele, Timothy M. Kowal and Teddy T. Davis for Respondent.

_____

Some years following their divorce, Khulood Cotta (wife) successfully sued Ihsan Shamaan (husband) to quiet title to real property and for nonpayment of a loan exceeding $1 million. Wife prevailed, quieting title to the properties and obtaining a money judgment for the unpaid loan. A few years later, wife died intestate. Husband sued her estate to obtain title to the properties; judgment was entered against him following the estate's successful demurrer. When the estate sought to enforce the underlying money judgment against husband, he moved to quash the writ of execution. That motion was denied. Husband appeals in both cases. We consolidated the appeals and now affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Properties Were Acquired During Marriage

Husband and wife, both doctors, were married in 1972, and separated in 1992. In addition to her claim for nonpayment of the loan, wife sought to quiet title on two properties acquired during their marriage. The first, 4171 Humboldt, in Huntington Beach, was acquired in 1986. They held title as "Husband and wife, as joint tenants." The second property consisted of two parcels, 4946 East Florence Avenue and 7231 Wilcox Avenue, in Bell. Husband and wife obtained title in 1993 (post-separation) also as "Husband and Wife, as Joint Tenants." Beginning in 1994, husband and wife jointly operated a medical center on the Florence/Wilcox property.

### 2. Wife Obtained Title in the Divorce

Husband and wife's divorce was finalized on September 10, 1998. The divorce decree distributed a number of the parties' assets. The Humboldt property was awarded to wife as part of her division of community property. Florence/Wilcox was confirmed as wife's separate property. It appears that deeds

2

effecting these distributions had been recorded in 1997. Husband transferred all his interest in Humboldt to wife, as her sole and separate property, via Interspousal Transfer Grant Deed. He quitclaimed Florence/Wilcox to her "Per Marital Settlement Agreement."

## 3. *Husband Obtained Title in 2010*

Twelve years later, in November 2010, wife signed quitclaim deeds for both properties in favor of husband.

## 4. *In 2015, Wife Obtained Judgment Against Husband For Return of the Properties and Over $1.3 Million*

### A. *Wife's Complaint*

On May 29, 2015, wife filed suit against husband (wife's quiet title action). Her verified complaint sought to quiet title to the properties, alleging that husband had wrongfully induced her into signing the 2010 quitclaim deeds while she was "hospitalized with a life-threatening condition, and was temporarily incapacitated due to the effect of her medication and medical condition." She also alleged that, beginning in 2008, she had loaned husband over $1.37 million, which he had agreed to repay, with interest, beginning in 2014, but had not done so.

### B. *Husband's Answer*

In husband's July 29, 2015 answer, he admitted a number of wife's allegations.[1] Specifically, he admitted the loan and that it was unpaid, although he denied that his nonpayment constituted a breach. He also admitted that wife was

---

[1]     Husband was self-represented. His answer claimed to be verified, but the document contained no verification, nor was it signed. While husband now contends he was untruthful in the positions he took in the answer, he does not suggest that he did not, in fact, take them.

3

hospitalized when she signed the deeds in his favor, but denied exerting undue influence or that the deeds lacked consideration.

    C.    *Judgment in Favor of Wife*

Based on husband's answer, wife obtained judgment on the pleadings with respect to several of her causes of action related to the nonpayment of $1.37 million (breach of oral contract, promissory estoppel, unjust enrichment, and money due).

Thereafter, wife sought summary adjudication of her causes of action to cancel the 2010 quitclaim deeds and quiet title in herself. At the summary adjudication hearing, husband indicated that he did not oppose wife's motion, "clarifying (not under oath) that he fully intended to transfer the deeds and the property back to [wife] after she recovered from the serious and debilitating illness, during which he was providing her medical services." The court granted the motion, finding that wife's declaration gave rise to a presumption of undue influence and husband's statements in court established there was no triable issue of material fact.

Judgment (the 2016 judgment) was entered in favor of wife, in the amount of $1.37 million. The judgment also provided that, on January 2, 2010, and at all times thereafter, wife was "the owner in fee simple" of the properties. The judgment specifically provided that no other person, including husband "now has any estate, right, title, interest, or claim in or to the real properties, or any part of the real properties, either legal or equitable, present or future, vested or contingent." The judgment was recorded on November 17, 2016.

**5.    Wife Died in 2018**

On July 11, 2018, wife died intestate. She possessed record title to the properties. On September 28, 2018, wife's brother,

respondent Saad Cotta, was appointed administrator of her estate.

**6.       *Husband Pursued His Own Quiet Title Action***

On December 27, 2018, husband filed suit against the estate (husband's quiet title action), alleging a number of causes of action, all directed toward obtaining return of the Humboldt and Florence/Wilcox properties (resulting trust, constructive trust, equitable liens, declaratory relief, quiet title, and specific performance).[2]

The basic theory of husband's verified complaint was this: wife's quiet title action was actually a collusive litigation (which husband prefers to call "collaborative"), jointly pursued by husband and wife for the purposes of defrauding property tax authorities and husband's creditors.  Specifically, husband alleged the following factual scenario:  He had made all down payment, mortgage, property tax and property insurance payments for the properties, giving rise to his ownership.  Although wife obtained the properties in the divorce, the division of property in the divorce did not "constitute the totality of their actual agreement," and, instead, title was placed in wife's name only to protect against future lawsuits and other creditors; husband and wife had always believed he retained equitable ownership.  In 2010, husband and wife had decided to finally effectuate their true divorce agreement, and wife quitclaimed the

---

[2]       Husband's complaint also referred to, and attached, a 2011 written agreement whereby wife transferred to husband ownership of the medical center, granting him the right to run the clinic in whatever way he deemed necessary.  Husband sought no relief as to the medical center, but the 2011 agreement would play a part in this litigation.

properties to husband. They had not anticipated that this transfer would result in the properties being reassessed for the purpose of property taxes. Husband could not afford the resulting increase in taxes, and sought legal counsel on how to avoid payment. Counsel advised that the taxes would revert to their prior level if the properties were transferred back to wife. However, husband was, at this point, facing a million dollar judgment in favor of a third party, and could not simply transfer the properties to wife without risking the transfers being set aside by his judgment creditor as fraudulent. Counsel therefore conceived a plan whereby title would be transferred back to wife by means of a collusive litigation. The 2016 judgment was the "outcome desired by both parties. Legal title was restored to [wife]. However, pursuant to the agreement between [husband and wife], equitable title remained held by [husband], as was always the intention of the parties."

7.    ***As Successive Demurrers Were Filed, Husband Changed His Theories***

The estate successfully demurred to the complaint, on the basis of res judicata and collateral estoppel. Defendant then filed his first and second amended verified complaints, which led to two more successful demurrers by the estate. In each of his amended complaints, husband reasserted his allegations that wife's quiet title action was collusive. However, he added allegations intended to avoid res judicata and collateral estoppel.

Specifically, in his first amended complaint, husband alleged that "[a]fter judgment was entered on August 3, 2016, [wife] renewed her oral agreement to hold the Subject Properties for [husband] as a constructive trustee." In his second amended complaint, the operative complaint, this allegation changed. No longer did wife simply "renew[]" her prior agreement, but

6

husband claimed a new agreement, supported by new consideration, following the 2016 judgment. He specifically alleged that, following the judgment, wife orally agreed to "transfer vesting of the properties" to him. In exchange, he would assume full responsibility for running the medical center, and continue to pay her a monthly stipend wholly unrelated to the amount of patients she would see.

### 8. *The Estate's Final Demurrer Was Sustained and Judgment Was Entered*

When the estate demurred to the second amended complaint, it argued against husband's suggestion of a postjudgment agreement supported by the consideration of husband's agreement to run the medical center and pay wife a monthly stipend. The estate pointed out that, based on husband's own exhibit, wife had conveyed the medical center to husband in 2011, nearly five years prior to the judgment, meaning husband's agreement to run the medical center could not have post-dated the judgment.

The trial court sustained the demurrer, concluding husband was barred by res judicata and collateral estoppel from relitigating wife's title to the property, as resolved by the 2016 judgment. The court was also unpersuaded by husband's attempts to allege a postjudgment oral agreement. The court observed that husband had alleged *not* a single postjudgment agreement, but an ongoing agreement which predated wife's quiet title action.

Judgment of dismissal of husband's quiet title action was entered on February 3, 2020. Husband filed a timely notice of appeal.

**9.**    *The Estate Commenced Enforcement of the Monetary Portion of the 2016 Judgment*

In 2019, while *husband's* quiet title action was pending, the estate obtained several writs of execution on the monetary portion of the 2016 judgment in *wife's* earlier quiet title action. In January 2020, the estate obtained an order for sale of property husband owned at 304 Muirfield Lane, in Walnut.[3]

**10.**    *Husband Moved to Quash the Writ of Execution*

On July 9, 2020, husband moved to quash the writ of execution and cancel the planned auction of Muirfield.[4]  Husband argued the writ should be quashed on the basis that the entire lawsuit was a "sham" to avoid taxes and wife had promised, both before and after the case was filed, not to enforce the judgment. He argued that wife herself had kept her promise not to enforce the 2016 judgment; it was only wife's estate that sought to collect after her death.

Husband argued the court should quash the writ under both law and equity.  His legal argument was based on wife's agreement not to enforce the 2016 judgment.  His equitable argument was as follows:  Although wife's quiet title action was collusive, it did not effect the intended result of reducing the tax

---

[3]    The Muirfield property had originally been awarded to wife in the divorce.  The record does not indicate how husband later came to hold his interest in Muirfield following the divorce.  In any event, the estate sought to sell husband's undivided one-half interest in the property to partially satisfy the $1.37 million judgment against husband.

[4]    The auction was held; the estate was the successful buyer; and the estate has since sold Muirfield to a third party.  This does not impact the current appeal; husband is challenging the writ of execution, not the order of sale.

assessments on the property; and husband ultimately paid the taxes in full, including penalties and interest. He also paid his judgment creditor. As such, he had purged himself of his wrongful conduct in engaging in the collusive lawsuit. Husband argued the court should refuse to enforce the 2016 judgment, as it would unjustly enrich wife's estate. As between husband and wife's administrator, husband argued the equities were with him. Husband relied on the doctrines of laches, equitable estoppel and unclean hands.[5]

## 11. *Husband's July 9, 2020 Declaration Changed Husband's Allegations One Last Time*

Husband submitted a July 9, 2020 declaration in connection with his motion to quash the writ of execution. The declaration is also relevant to his appeal of the judgment in husband's quiet title action. Specifically, at his request, we granted judicial notice of the declaration in connection with that appeal. Husband represents that the declaration sets forth the facts he would allege if he were given leave to file a third amended complaint.

In his declaration, husband again explained that he "reposed trust and confidence in [wife] allowing her to retain legal title to millions of dollars in real estate and to obtain the judgment in this case, all on our agreement and her representation that she was holding the real estate in trust for me and that this judgment was simply a device to attempt to reverse property tax revaluations. Eventually, I paid all of the property taxes plus penalties and interest." He stated that between husband and wife, the 2016 judgment and the judgment

---

[5]    Husband accused the administrator of wife's estate of breaching wife's agreement, which is "offensive to decency and equity . . . ."

of dissolution "were always subordinate to our agreements outside of court. (We believed it was legal to do this.)"

Husband's declaration then explained, at length, numerous financial arrangements he purportedly entered into with wife, many of which predated the 2016 judgment. In summary, he stated that a number of properties, including Humboldt and Florence/Wilcox, had always been his separate property, but wife agreed to hold title to them as an asset protection mechanism (husband was a surgeon and wife a family practitioner; husband believed surgeons were more likely to be sued). Both before and after the 2016 judgment quieting title in wife's favor, wife assured husband that she held title to the properties on husband's behalf, and he paid the taxes and maintenance expenses in reliance on her promises that she was holding the properties in trust for him.

According to husband, wife worked for him at the medical center "for many years" and he paid her "substantially more than the value of her work [which was] part of her consideration for keeping the properties in trust for [him]."[6]

_____

[6] Husband's declaration was supported by a number of exhibits, including monthly checks paid to wife, in amounts somewhat near $4000 per month, from an account in the name of the medical center. The exhibits raise more questions than they answer. For example, a number of the checks were signed by wife, not husband. Husband's declaration explained that even though the bank accounts were maintained in wife's name, they were husband's accounts and he, with wife's permission, signed her name to the checks. Husband relied on no pay stubs, no bank statements, no ledgers, and no accounting. He simply claims that checks written to wife, by wife, on an account in the name of the medical center actually constituted payment by husband of wife's agreed-upon stipend.

Husband's declaration did not assert the existence of a specific agreement following the 2016 judgment by which he gave wife any consideration for not enforcing it.[7]  Instead, he stated that both he and wife "ignored the judgment in this case . . . , except that we used the judgment to transfer the properties back to her for the purposes of asset protection."

Although husband's declaration was submitted in connection with his motion to quash the estate's writ of execution on the monetary portion of the 2016 judgment, very little of the declaration actually addressed the $1.37 million judgment itself. Indeed, although husband represented that wife's quiet title action was jointly pursued for purposes of tax avoidance, he made no effort to explain why it was that wife pursued a separate claim for the $1.37 million.  He simply stated that wife never loaned him those funds and any allegations in her complaint and admissions in his answer to the contrary "are incorrect."  He stated, "We had agreed with respect to the judgment for money that she would not attempt to enforce it against me, and she took

---

[7]     Husband instead refers to other agreements he and wife purportedly made regarding their finances.  For example, he states, "*In 2015* we also entered into an agreement *relating to our retirement*." (Emphasis added.)  Under that agreement, husband would continue paying wife $4,000 per month for the rest of her life.  Husband would sell Humboldt and Muirfield, and use the money to build a multi-unit apartment building on Florence/Wilcox, which would be the source of the $4,000 monthly payments to wife.  Husband would also "purchase a modest house" for wife near where her brothers lived, and she would live there "for free for the rest of her life."  Husband represented that, prior to wife's death, he was beginning to put this agreement into effect.

no steps to enforce the judgment for $1.37 million while she was alive for a period of almost two years."[8]

## 12. *The Estate Opposed the Motion to Quash*

The estate opposed husband's motion to quash the writ of execution, on a number of bases. Among them, the estate argued that husband's arguments were not really directed to the writ of execution itself, but were in actuality a collateral attack on the underlying judgment in wife's quiet title action. To the extent husband suggested there was an agreement following the 2016 judgment by which wife agreed to hold the properties in trust for husband, the estate argued the agreement violated the statute of frauds, requiring trusts for real property to be in writing. (Prob. Code, § 15206; Civ. Code, § 1624, subd. (a)(3).) The estate also argued the equities were with the estate, not husband.

## 13. *As Part of His Reply Memorandum, Husband Sought A Day-Long Hearing*

In his reply, husband again argued that the equities favored quashing the writ of execution. In response to the estate's assertion of the statute of frauds, husband responded that the postjudgment agreement could be enforced because it had been partly performed and failure to enforce it would work an unconscionable injury.

---

[8] In his brief on appeal, husband suggests that the $1.37 million component of the 2016 judgment was "for the possible purpose of transferring monetary assets to [wife] in advance of tax assessors or other possible creditors." There is nothing in the record supporting husband's assertion that this was the reason for the monetary component of the judgment. To the contrary, the record of the quiet title action confirms that the $1.37 million judgment was on an unpaid loan which husband admitted in his answer.

12

Husband also filed a request, under California Rules of Court, rule 3.1306, for a hearing with seven hours of oral testimony. Husband's request indicated that the "nature and extent" of his testimony "will be the facts and exhibits described in his declaration" plus additional facts and exhibits "unearthed by counsel and [husband] since the filing of the motion." He expected to testify to the agreements between husband and wife, both before and after the 2016 judgment, including wife's purported agreement not to execute.[9]

### 14. *Hearing, Ruling and Appeal*

On October 14, 2020, the motion was argued by counsel and taken under submission. The court's minute order indicates there was no court reporter or electronic recording monitor, so there is no reporter's transcript. Husband has made no effort to obtain a settled statement on appeal. (Cal. Rules of Court, rule 8.137.)

The court issued its ruling on October 27, 2020. The court began with the premise that the burden was on husband, as the judgment debtor, to demonstrate why the writ of execution should be quashed. After reviewing the statements in husband's declaration, the court ruled that the equities were against husband. Specifically, if husband was correct and wife's quiet title action was collusive, then both husband and wife were blameworthy for jointly committing fraud. But husband "was the more blameworthy party because the scheme to reverse his property tax liability would have solely benefited him." The court was not persuaded by husband's argument that his fraud was

---

[9] Husband had also submitted the declaration of his employee, which confirmed husband's declaration in a few particulars. He represented that she would testify to the matters in her declaration.

purged because he had ultimately paid the taxes, stating that the only evidence that husband had paid the taxes was his own declaration – a declaration which, according to the court, "gives this Court a reasonable feeling of uncertainty." At bottom, the court held that husband's motion was a collateral attack on the 2016 judgment. To the extent husband asserted a postjudgment agreement not to enforce the judgment, that agreement itself was executed to perpetuate tax fraud and is therefore not enforceable. The motion to quash was denied.

Husband filed a timely notice of appeal.

## 15. *The Appeals Were Consolidated*

After husband filed his opening briefs in his two appeals, we granted his motion to consolidate for purposes of respondent's brief, reply brief, oral argument, and decision.

## *DISCUSSION*

We first consider husband's appeal from the judgment following demurrer in husband's quiet title action. Then, we consider husband's appeal from the denial of his motion to quash the writ of execution on the 2016 judgment.

## 1. *Husband's Appeal of the Judgment in Husband's Quiet Title Action*

Husband argues the court erred in sustaining without leave to amend the estate's demurrer to his second amended complaint. Also, he argues that we should consider his declaration (from his motion to quash the writ of execution) as the basis for a future amendment.

### A. *Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.

14

[Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) To meet [the] burden of showing abuse of discretion, the plaintiff must show how the complaint can be amended to state a cause of action. [Citation.] However, such a showing need not be made in the trial court so long as it is made to the reviewing court." (*William S. Hart Union High School Dist. v. Regional Planning Com.* (1991) 226 Cal.App.3d 1612, 1621.)

B.    *The Demurrer Was Properly Sustained to the Second Amended Complaint*

Husband's second amended complaint sought title to the Humboldt and Florence/Wilcox properties on a number of theories. Rather than consider each individual theory, we instead focus on two time periods – husband's claims arising prior to the 2016 judgment and those arising after.

(1)    *Claims Prior to the 2016 Judgment are Barred by Issue Preclusion*

Issue preclusion, or collateral estoppel, "prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. [Citation.] Under issue preclusion, the prior judgment conclusively resolves

15

an issue actually litigated and determined in the first action. [Citation.]" (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.) "In summary, issue preclusion applies: (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party. [Citations.]" (*Id.* at p. 825.)

To the extent husband's quiet title action seeks the Humboldt and Florence/Wilcox properties based on agreement or conduct predating the 2016 judgment, it is barred by issue preclusion. That judgment expressly held that wife was "the owner in fee simple" of the properties and that no other person, including husband, had any "right, title interest or claim in or to the real properties." This constitutes (1) a final adjudication; of (2) the identical issue of whether husband had an interest in the properties; (3) which was actually litigated by wife's summary adjudication motion; (4) against husband, a party to wife's quiet title action.

> (2) *Claims Based on a Postjudgment Oral Agreement are Barred by the Statute of Frauds*

On appeal, husband argues that the entirety of his second amended complaint is based on rights that arose after the 2016 judgment – specifically, wife's postjudgment oral agreement to give husband equitable title in the properties anew.

Claims based on this theory are barred by the statute of frauds.[10] Probate Code section 15206 explains that a trust in real

---

[10] Husband rightly observes that the estate did not argue the statute of frauds in husband's quiet title action. The estate did, however, raise the theory in connection with husband's motion to quash the writ of execution, giving husband the opportunity to

property is not valid unless evidenced in writing or by operation of law. Husband argues that the trust arose by operation of law, as a constructive trust. The doctrine of constructive trust is predicated on Civil Code section 2224, which provides, "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." To establish a constructive trust, plaintiffs must prove: the existence of a res (property or some interest in the property); the plaintiff's right to that res; and the defendant's acquisition of the res by some wrongful act. (*Pac. Lumber Co. v. Superior Court* (1990) 226 Cal.App.3d 371, 377.) Husband's argument of a constructive trust necessarily fails on the third element. He cannot establish wife *gained* the property by a wrongful act, because she gained the property by the 2016 judgment. Husband is attempting to rely on a new postjudgment agreement giving him an interest in the property *which was already owned by wife*. "[T]he mere failure to perform an oral promise to convey real property is not a fraud and a constructive trust cannot be founded on such fact alone." (*Walter H. Leimert Co. v. Woodson* (1954) 125 Cal.App.2d 186, 192.)

C.     *Husband Cannot Amend to State a Claim*

Having concluded the trial court did not err in sustaining the demurrer to husband's second amended complaint, we turn to husband's argument that he should be permitted to amend to state a claim.

---

address it before the trial court. In any event, if "another proper ground for sustaining the demurrer exists, this court will still affirm the demurrer." (*Abatti v. Imperial Irrigation Dist.* (2020) 52 Cal.App.5th 236, 295.)

17

First, husband argues he could allege in an amended complaint two additional bases for avoiding the statute of frauds: equitable estoppel and part performance. He argues that wife's promise to give him back the properties must be enforced because he expended funds in reliance on her promise and the estate would be unjustly enriched if it were permitted to retain the properties. Husband alleges he paid wife a monthly stipend and paid taxes on the properties. He does not allege that he took possession of the properties, made improvements on them, or irrevocably changed his position. That is the type of unjust enrichment that would arguably avoid application of the statute of frauds. (*Mulli v. Mulli* (1951) 105 Cal.App.2d 68, 73-74.)

Next, armed with his declaration, husband hopes, for the first time, to bring a collateral attack against the 2016 judgment itself, for extrinsic fraud/mutual mistake. Husband argues that he would allege that he and wife were operating under a mutual mistake of law with regard to the possible effect of the judgment in wife's quiet title action. Specifically, as stated in his declaration, "both of us understood that the [2016] Judgment was simply a formality in furtherance of our agreement, and neither at any time before the judgment believed it could have a possible legal effect of changing our legal rights in the concerned properties."

In exceptional circumstances, a court sitting in equity can set aside a valid final judgment. (*Kulchar v. Kulchar* (1969) 1 Cal.3d 467, 470.) "Extrinsic fraud usually arises when a party is denied a fair adversary hearing because he has been 'deliberately kept in ignorance of the action or proceeding, or in some other way fraudulently prevented from presenting his claim or defense.' [Citation.]" (*Id.* at p. 471.)

18

"The right to relief has also been extended to cases involving extrinsic mistake. [Citations.] 'In some cases . . . the ground of relief is not so much the fraud or other misconduct of the defendant as it is the excusable neglect of the plaintiff to appear and present his claim or defense. If such neglect results in an unjust judgment, *without a fair adversary hearing*, the basis for equitable relief is present, and is often called "extrinsic mistake." ' [Citation.]" (*Kulchar v. Kulchar, supra,* 1 Cal.3d at p. 471.)

The facts in husband's declaration would not establish extrinsic fraud or mutual mistake. Husband did not fail to fully defend against wife's quiet title action because he was fraudulently prevented from doing so or he suffered from excusable neglect; he did not enthusiastically defend because, as he argued in his motion to quash, the quiet title action was a "sham" engineered to reverse tax assessments.

"Relief is . . . denied when the complaining party has contributed to the fraud or mistake giving rise to the judgment thus obtained. [Citations.] 'If the complainant was guilty of negligence in permitting the fraud to be practiced or the mistake to occur equity will deny relief.' [Citation.]" (*Kulchar v Kulchar, supra,* 1 Cal.3d at p. 473.)

Husband recognizes that he was culpable in his collusive pursuit of wife's quiet title action, but suggests he should nonetheless prevail because *both* he and wife were at fault, requiring a balancing of the equities. Husband is mistaken.

We are guided by *Fonner v. Martens* (1921) 186 Cal. 623 (*Fonner*). In that case, the plaintiff, in an apparent effort to shield assets from the plaintiff's wife, who was divorcing him, deeded a property to the defendant. Following the divorce, the plaintiff's wife brought an action to partition the property,

19

alleging that she and the plaintiff each owned half the property. Both the plaintiff and the defendant testified that, instead, the plaintiff had previously sold the property entirely to the defendant. The partition court believed them and held the defendant owned the property, to the exclusion of both the plaintiff and plaintiff's wife. (*Id.* at pp. 624-627.) After that judgment was final, the plaintiff claimed that he had simply mortgaged the property to the defendant, and sought to quiet his title. (*Id.* at pp. 623-624.) The trial court found in favor of the plaintiff, and our Supreme Court reversed, holding the plaintiff bound by the judgment in the partition action. (*Id.* at p. 628.) "It is well settled that the mere fact that the judgment was procured by misrepresentations and false testimony in matters intrinsic to the action cannot afford respondent any relief, even if he had not himself been a party to the fraud [citations] and *a judgment which the parties themselves have obtained by fraudulent collusion is not open to attack by either party*." (*Id.* at p. 628, italics added.) There was no balancing of the equities; the court simply left the parties where it found them. Indeed, the plaintiff argued that the scheme had been of the defendant's design. The court stated that, if this were true, it would not relieve the plaintiff from "the onus of his share in the deceit."[11] (*Id.* at p. 629.)

---

[11] Husband relies instead on *Bradley Co. v. Bradley* (1913) 165 Cal. 237, a case which the *Fonner* court distinguished. (*Fonner, supra,* 186 Cal. at p. 630.) *Bradley* involved no intent to defraud; the transferor had conveyed the property in trust to his future wife, simply because he wanted to obtain a loan on the property without his employer knowing. (*Id.* at pp. 238-240.) That is a far cry from this case, in which husband claims he

20

Husband claims that, since he ultimately paid the property taxes and his judgment creditor, he has purged his unclean hands. The assertion does not support the claimed result.[12] Husband is here seeking equitable relief from a judgment that by his admission he fraudulently colluded to obtain. He now claims mutual mistake, seeking to undo the judgment, on the basis that his planned fraudulent scheme failed to work. This is not the type of extraordinary circumstance which justifies equitable relief.

2. ***Husband's Appeal of the Denial of His Motion to Quash the Writ of Execution***

Husband raises three arguments against the court's ruling on his motion to quash the writ of execution: (1) he presented sufficient evidence that wife had agreed not to enforce the 2016 judgment; (2) he presented sufficient evidence that events occurring after the entry of the 2016 judgment render its enforcement inequitable; and (3) the court erred in denying him a hearing with oral testimony.

Before we address husband's arguments, we believe an overview of satisfaction of judgment procedures is helpful.

---

always was the owner of the property but shifted paper title back to wife in order to commit tax fraud and defraud creditors.

[12] Husband relies on authority that a transfer intended to defraud a creditor loses its fraudulent character when the creditor is not, in fact, defrauded. (E.g., *Estate of Blanco* (1978) 86 Cal.App.3d 826, 834, 836; *Hill v. Younkin* (1969) 274 Cal.App.2d 880, 883-884.) These cases dealing with the unclean hands caused by a fraudulent transfer are inapplicable here, where the fraud was a collusive lawsuit.

A. *Procedures For Documenting Satisfaction of Judgment*

A judgment "may be satisfied by payment of the full amount required to satisfy the judgment or by acceptance by the judgment creditor of a lesser sum in full satisfaction of the judgment." (Code Civ. Proc., § 724.010, subd. (a).)  The judgment will also be satisfied if the creditor has executed a binding covenant not to execute the judgment at all.  (*Yanchor v. Kagan* (1971) 22 Cal.App.3d 544, 552.)

"When a money judgment is satisfied, the judgment creditor immediately shall file with the court an acknowledgement of satisfaction of judgment."  (Code Civ. Proc. Code, § 724.030.)  If the judgment has been satisfied, the judgment debtor may serve on the judgment creditor a written demand that the judgment creditor file the acknowledgement of satisfaction with the court.  (Code Civ. Proc., § 724.050, subd. (a).)  If the judgment creditor does not comply with the demand within 15 days, the judgment debtor may apply to the court for an order requiring the judgment creditor to comply.  If the court determines the judgment has been satisfied, the court will either order the creditor to comply with the demand or direct the clerk to enter satisfaction of judgment.  (Code Civ. Proc., § 724.050, subd. (d).)  "[S]ection 724.050 provides the method for a judgment debtor to enforce a judgment creditor's agreement to accept less than the full amount of the judgment and obtain an acknowledgment of satisfaction of judgment after tendering or paying that agreed-on lesser amount.  When a judgment debtor files a section 724.050 motion, the court may determine whether there was an agreement for satisfaction of the judgment by payment of less than the full amount of the judgment.  [Citation.]"  (*Horath v. Hess* (2014) 225 Cal.App.4th 456, 466.)

22

Husband did not follow this procedure. Instead, he sought to establish the judgment was satisfied by challenging the writ of execution. "[A] court of equity may quash the execution and cancel the judgment upon persuasive proof of an agreement that satisfied the judgment. [Citations.]" (*Colby v. Colby* (1954) 127 Cal.App.2d 602, 605.) The court's decision is reviewed both for sufficient evidence and as an exercise of its equitable discretion. (*Id.* at pp. 605-606.)

B.  *Husband Did Not Establish Wife Agreed Not to Enforce the 2016 Judgment*

On appeal, husband argues that wife agreed to not enforce the 2016 judgment. In an attempt to argue around the court's ruling that his motion to quash was merely a collateral attack on the judgment, he now claims that he is relying solely on an agreement postdating the 2016 judgment itself. But husband's declaration does not support a postjudgment agreement.

It is important to remember that the estate's writ of execution which husband sought to quash related only to the monetary portion of the 2016 judgment. Husband's declaration made only a single mention of any agreement not to execute on the money judgment. He stated, "*We had agreed* with respect to the judgment for money that she would not attempt to enforce it against me, and she took no steps to enforce the judgment for $1.37 million while she was alive for a period of almost two years." (Italics added.) This language refers only to a prior agreement, and does not support the existence of a postjudgment agreement not to execute the money judgment.

C.  *Husband Did Not Establish His Equitable Arguments*

Husband relies on three equitable doctrines to support his motion to quash the writ of execution – laches (by wife's non-enforcement and her estate's attempt to do so after she died),

equitable estoppel (by wife's oral promise of non-enforcement), and unclean hands (by balancing his wrongdoing against the estate's).

We focus our discussion on laches. "The elements of laches are (1) the failure to assert a right, (2) for some appreciable period so as to amount to unreasonable delay, (3) which results in prejudice to the adverse party. [Citations.] Laches is an equitable defense, the existence of which is a matter commended to the discretion of the trial court, 'and in the absence of manifest injustice or lack of substantial support in the evidence, the trial court's determination will be sustained. [Citation.]' [Citations]." (*In re Marriage of Powers* (1990) 218 Cal.App.3d 626, 642-643.) The trial court did not expressly rule on laches, so we make the necessary presumption in favor of the judgment and assume the court impliedly rejected laches. (*Id.* at p. 643, fn. 17.)

Husband argues that the combination of wife not attempting to execute the judgment during her lifetime, followed by the estate attempting to execute after wife is no longer available as a witness, establishes laches. He argues he was prejudiced by the delay, because he has now lost wife as a potential witness to the non-enforcement agreement he alleges she made.

Yet it is wife who is prejudiced by husband's failure to pursue an acknowledgement of satisfaction during wife's lifetime. If husband believed the money judgment was truly satisfied by agreement, he had nearly two years in which he could have asked wife to file a satisfaction of judgment and, if she declined, bring a motion under Code of Civil Procedure section 724.050 in order to compel her to do so. Had husband brought such a motion, the court would have heard both husband and wife on the issue of whether the judgment was satisfied. Instead, husband failed to

24

timely make the assertion, allowed the $1.37 million judgment to remain unsatisfied in the court's records, and only asserted satisfaction after wife had died and was no longer able to testify against him. Husband failed to establish laches on the part of the estate; if anything, he established that his own claim was barred by laches.[13]

Our conclusion is the same with respect to equitable estoppel and unclean hands. The equities in this case cannot favor husband.

D. *Husband Has Not Established the Court Erred in Denying Him Live Testimony*

Defendant claims the trial court erred by denying his request for an evidentiary hearing on the motion to quash at which he and perhaps others would testify. "Evidence received at a law and motion hearing must be by declaration or request for judicial notice without testimony or cross-examination, unless the court orders otherwise for good cause shown." (Cal. Rules of Court, rule 3.1306(a).) A party can request to present oral evidence at a hearing. (Cal. Rules of Court, rule 3.1306(b).) Such a request is directed to the discretion of the trial court. (*Ashburn v. AIG Financial Advisors, Inc.* (2015) 234 Cal.App.4th 79, 96.) Husband argues the court abused its discretion by denying his request. Husband has failed to establish the necessary predicate for this argument: that his request was denied. There is no reporter's transcript, and the court's minute order simply shows husband was present, not that his testimony was offered and/or

---

[13] This is particularly true in this case because husband relies not on a written agreement, or even an express oral one, but on his claim that he and wife "renewed their agreements in an informal and ongoing series . . . ."

25

rejected. As appellant, husband has the burden to provide a record affirmatively demonstrating error. Failure to provide an adequate record requires that the issue be resolved against him. (*In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 312.)

### DISPOSITION

The judgment of dismissal of husband's quiet title action is affirmed. The order denying husband's motion to quash the writ of execution in wife's quiet title action is affirmed. Husband is to pay the estate's costs on appeal.


RUBIN, P. J.

WE CONCUR:


MOOR J.


KIM, J.